IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| OXFORD MEDIA GROUP, INC., | ) |
| Plaintiff/Counter Defendant, | ) |
| v. | ) Case No. 16 C 7511 |
| FAMILY WORSHIP CENTER CHURCH, INC. | ) Judge Jorge L. Alonso |
| Defendant/Counter Plaintiff. | ) |

## MEMORANDUM OPINION AND ORDER

This dispute concerns several contracts between plaintiff/counter defendant Oxford Media Group, Inc. ("Oxford Media") and defendant/counter plaintiff Family Worship Center Church, Inc. ("FWCC"). The parties entered into two contracts regarding the distribution of FWCC's religious television programming. When negotiating the third contract, discussions soured between the parties, and Oxford Media stopped distributing FWCC's programming. Oxford Media then filed suit against FWCC, seeking declaratory relief as well as damages resulting from breach of contract. FWCC counterclaimed, alleging breach of contract (Count I), fraud (Count II), money had and received (Count III), and account stated (Count IV). Before the Court is Oxford Media's motion to dismiss FWCC's counter-complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

FWCC alleges the following facts in its counter-complaint, which this Court accepts as true for purposes of the instant motion and draws all reasonable inferences in FWCC's favor. Oxford Media is a corporation licensed to broadcast television signals in Chicago, Illinois. (*Id.*

¶ 2.) Oxford Media uses the call letters WJYS; WJYS operates as the Prism Channel. (*Id.*) Family Worship Center Church, Inc. ("FWCC") is a non-profit religious corporation based in Louisiana. (Countercl. ¶ 1.) FWCC produces and distributes religious television programming worldwide under the SonLife Broadcasting Network ("SBN") banner. (*Id.* ¶ 3.)

In 2014, FWCC was airing its programming in the Chicagoland area through cable and over-the-air broadcast distribution. (*Id.* ¶¶ 5, 9.) In early 2014, Oxford Media and FWCC representatives met to discuss the possibility of expanding FWCC's reach through Oxford Media by airing its programming on the Prism Channel around-the-clock (twenty-four-hours-a-day, seven-days-a-week) on Comcast cable systems in Indiana, Wisconsin, Michigan, and elsewhere in Illinois. (*Id.* ¶¶ 6, 9, 10.) Additionally, the parties discussed airing FWCC programming with a greater over-the-air broadcast range to allow FWCC to reach non-cable/satellite households in areas outside of FWCC's existing signal. (*Id.*) During the meeting, Oxford Media provided FWCC with written marketing materials that identified the Prism Channel's reach (coverage of 4.2 million households in the Chicago market, which translates to nearly 11 million people). (*Id.* ¶ 6, Ex. 1.) The marketing materials indicated that the Prism Channel could be found on certain channels offered in Chicago and elsewhere in Illinois, as well as Wisconsin, Indiana, and Michigan. (*Id.*)

Negotiations soon commenced, and the parties modified Paragraph 1(d) of the Contract, entitled "Right to Modify Terms of Payment," to include, in pertinent part, the following underlined language:

> It is understood by all parties to this contract that Agency's acceptance of the rate stated herein is based solely upon the total number of households to which Oxford Media Group, Inc. will provide distribution, calculated as of the date identified as the "Start Date" on page one of this contract and including, but not limited to, all over-the-air households as well as those subscriber households on Comcast Cable

in the Chicago DMA[1] <u>including Comcast Chicago (Channel 385 and 687), Comcast Illinois, Comcast Wisconsin, Comcast Northwestern Indiana and Comcast Michigan.</u> The loss of any and/or all of the cable subscriber households shall result in a reduction in Agency's rate by $.42 per household lost.

(*Id.* ¶ 11.) FWCC indicated that it was entering the agreement based upon Oxford Media's confirmation that Comcast carried the Prism Channel in all of the areas listed in Paragraph 1(d), as stated in the Prism Marketing Materials. (*Id.* ¶¶ 14-15.)

On May 16, 2014, the parties executed a contract, effective June 1, 2014 to May 31, 2015, (the "2014 Contract"). (*Id.* ¶ 17, Ex. 4.) Pursuant to the agreement, FWCC purchased round-the-clock distribution of its programming on the Prism Channel (through over-the-air broadcasting and the Comcast cable systems described in the Prism Marketing Materials) and at an annual rate of $1.8 million. (*Id.* ¶¶ 8, 20.)

On April 22, 2015, the parties renewed the contract, effective June 2015 to May 2016, with identical terms and conditions to the 2014 Contract (the "2015 Contract"). (*Id*. ¶ 21; Ex. 5.)

On February 25, 2016, the parties met to discuss renewal of the contract. (*Id.* ¶¶ 22-23.) During negotiations, Oxford Media sought a rate increase, which FWCC rejected. (*Id*. ¶ 23.) In late May 2016, the parties continued to negotiate and focused their discussions on a proposed rate increase as well as the scope of the Prism Channel's coverage. (*Id.* ¶¶ 41-49; Exs 15-16.) On May 31, 2016, Oxford Media sent FWCC two draft contracts to memorialize a purported agreement. (*Id*. ¶ 53; Ex 27.) FWCC did not sign the contracts, and the 2015 Contract expired.[2] (*Id*. ¶ 54.)

---

[1] A Designated Market Area ("DMA") refers to a commercial broadcast television station's market as determined by Nielsen Media Research. *See* Pl/Counter-Def's Reply, at p. 4.

[2] Under the terms of the 2015 Contract, FWCC was required to notify Oxford Media of its intent to renew by May 1, 2016 (at least thirty days prior to the expiration of the current contract on May 31, 2016). (*Id*. ¶ 30.)

3

Around this time, FWCC conducted an independent investigation and determined, based on SNL Kagan reports, that the Prism Channel was not distributed on Comcast in Wisconsin, Michigan or Indiana (aside from areas receiving the Comcast Chicago channel line-up) and that the Prism Channel's over-the-air audience was significantly less than promised. (*Id.* ¶¶ 57-59.) Based on these figures, FWCC concluded that it had overpaid Oxford Media by more than two million dollars. (*Id.* ¶ 60.)

On June 7, 2016, FWCC notified Oxford Media that it was not going to renew the Prism contract for 2016-2017, demanded Oxford Media to stop distributing its programming, and requested a final invoice. (*Id.* ¶¶ 62, 62; Ex. 31.) The following day, Oxford Media stopped distributing SBN on the Prism Channel.

On July 14, 2016, Oxford Media sent FWCC a credit statement showing that it owed FWCC a credit in the amount of $186,437.44. (*Id.* ¶¶ 64, 65; Ex. 32.) On July 15, 2016, FWCC sent Oxford Media a letter demanding a refund of $2,040,175.21 pursuant to the rate adjustment clause in the 2014 and 2015 Contracts and for unused airtime for June 2016. (*Id.* ¶ 66; Ex. 33.)

## STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a pleading that purports to state a claim for relief must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56; *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together."). For purposes of a motion to dismiss, the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's

favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). When ruling on a Rule 12(b)(6) motion, the court considers "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 604 (7th Cir. 2013) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 745-46 n. 1 (7th Cir.2012)).

A complaint alleging fraud must satisfy Federal Rule of Civil Procedure 9(b), pursuant to which a party "alleging fraud or mistake…must state with particularity the circumstances constituting fraud or mistake." This is often described as requiring a plaintiff to plead "the who, what, when, where and how" of the alleged fraud. *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003). For purposes of a motion to dismiss for failure to comply with Rule 9(b), the court takes the allegations in the complaint as true and makes all reasonable inferences in the plaintiff's favor. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).

## DISCUSSION

**Count I – Breach of Contract**

Oxford Media moves to dismiss, arguing that FWCC has failed to plead facts sufficient to show that Oxford Media breached any obligation in the 2014 and 2015 Contracts. To assert a valid claim for breach of contract under Illinois law, a plaintiff must show "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) the resultant damages." *Hongbo Han v. United Cont'l Holdings, Inc.*, 762 F.3d 598, 600 (7th Cir. 2014) (quoting *Reger Dev., L.L.C. v. Nat'l City Bank*, 592 F.3d 759, 764

5

(7th Cir. 2010)). If, at face value, the language of the agreement is clear and unambiguous, parol evidence is not to be used. *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 993 (7th Cir. 2007). However, if the language is susceptible to more than one meaning, an ambiguity exists, and parol evidence may be utilized to resolve the intent of the parties. *Id.*

FWCC has advanced three theories of breach. All theories involve the interpretation of Paragraph 1(d) of the 2014 and 2015 Contracts. The Court will therefore examine the language in Paragraph 1(d), which states in relevant part:

> It is understood by all parties to this contract that Agency's acceptance of the rate stated herein is based solely upon the total number of households to which Oxford Media Group, Inc. will provide distribution, calculated as of the date identified as the "Start Date" on page one of this contract and including, but not limited to, all over-the-air households as well as those subscriber households on Comcast Cable in the Chicago DMA including Comcast Chicago (Channel 385 and 687), Comcast Illinois, Comcast Wisconsin, Comcast Northwestern Indiana and Comcast Michigan. The loss of any and/or all of the cable subscriber households shall result in a reduction in Agency's rate by $.42 per household lost.

(Countercl. Ex 4.).

Oxford Media asserts that it did not breach the 2014 and 2015 Contracts because the Contracts did not define the scope of the Prism Channel's market reach in Paragraph 1(d), and the phrase "those subscriber households" did not require the Prism Channel to be carried on all of the identified markets (Chicago, elsewhere in Illinois, Wisconsin, Northwestern Indiana and Michigan). To support this assertion, Oxford Media contends that it does not control the scope of its coverage on Comcast and therefore could not have made a commitment to provide coverage within specific states. Oxford Media further argues that FWCC has sophisticated experience in the industry and should have known that a network's viewership reach changes.

FWCC contends that Oxford Media breached the Contracts because the language in Paragraph 1(d) represented a promise to carry the Prism Channel on all of the identified markets.

6

FWCC points to the language of the Contract, the fact that the parties specifically initialed Paragraph 1(d), and certain communications between the parties to show that Oxford Media represented to FWCC that the Prism Channel was carried on all of the Comcast networks identified in Paragraph 1(d). FWCC further alleges that it would not have proceeded with the 2014 Contract unless the distribution coverage was in line with FWCC's interpretation.

This Court finds that the language in Paragraph 1(d) is ambiguous in that it is susceptible to more than one meaning regarding the scope of the Prism Channel's coverage. It is not clear whether the language definitively defines the scope of coverage and distribution agreed to by the parties. Because ambiguity exists, parol evidence should be considered to determine the parties' intent and contractual obligations. This step—determining intent and contractual obligation—is a question of fact that is not appropriate to resolve at the motion to dismiss stage. *See Bank of America, N.A. v. Oberman, Tivoli & Pickert, Inc.*, 12 F.Supp.3d 1092, 1100 (N.D. Ill. Jan. 22, 2014) (denying motion to dismiss when contract is ambiguous and parol evidence is needed to determine the parties' intent).

The Court also finds that FWCC has pled facts sufficient to allege a claim of breach of contract. FWCC alleges that Oxford Media did not provide distribution on the Prism Channel as promised, that it would not have executed the Contracts without the promised distribution, and that Oxford Media has refused to refund FWCC as required by Paragraph 1(d). Considering these allegations and drawing all inferences in the light most favorable to FWCC, the Court finds that FWCC's reading of the Contracts is plausible and that it has sufficiently stated a breach of contract claim. Accordingly, Oxford Media's motion to dismiss Count I is denied.

**Count II – Fraud**

FWCC asserts that Oxford Media repeatedly misrepresented the reach of the Prism Channel's signal to induce FWCC to enter into distribution contracts with Oxford Media. Oxford Media moves to dismiss, arguing that FWCC's fraud claim fails because the alleged misrepresentations involved statements related to future conduct only. Oxford Media further argues that FWCC's reliance on the statements was unreasonable and that FWCC has not alleged damages necessary to state a claim for fraud.

To state a common law claim for fraud under Illinois law, a plaintiff must show "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of that statement; and (5) plaintiff's damages resulting from reliance on the statement." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 613 (7th Cir. 2013) (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 891 (Ill. 1996)). A plaintiff may, instead of knowledge that a statement was false, show that defendant was culpably ignorant of a statement's truth. *Lucini Italia Co. v. Grappolini*, 231 F.Supp.2d 764, 771 (N.D. Ill. 2002). Additionally, the pleader must allege that its belief in the false statement and reliance on it was reasonable. *Triumph Packaging Grp. v. Ward*, 877 F.Supp.2d 629 (N.D. Ill. 2012). Finally, the allegations must meet the heightened pleading standards in Rule 9(b). *Borsellino*, 477 F.3d at 507.

*False Statement of Material Fact*

The parties first dispute whether the alleged false statements made by Oxford Media involved statements of current fact or statements of future conduct. Generally, Illinois does not recognize a cause of action where the alleged misrepresentation relates to a future or contingent event. *Bensdorf & Johnson, Inc. v. N. Telecom Ltd.*, 58 F.Supp.2d 874, 881 (N.D. Ill. 1999). An

8

exception to this rule exists when the party alleging fraud is able show that the misrepresentations are part of a "scheme to defraud." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012).

Oxford Media's statements to FWCC arguably involved statements of current facts. In the counter-complaint, FWCC specifically alleges that Oxford Media enticed FWCC to purchase time on the Prism Channel through the following conduct: Oxford Media presented FWCC with marketing materials, which stated that the Prism Channel's signal covered 4.2 million households and reached nearly 11 million people via Comcast in Chicago, elsewhere in Illinois, Wisconsin, Indiana, and Michigan. Oxford Media also promised a greater over-the-air broadcast range through the Prism Channel. When negotiating the 2014 Contract, FWCC notified Oxford Media that it had concerns about the scope of the Prism Channel's coverage, particularly as listed in Paragraph 1(d). FWCC indicated that it understood the Prism Channel's coverage to include Comcast Chicago, Comcast Illinois, Wisconsin, Indiana and Michigan. Without this coverage, FWCC would have been unwilling to contract with Oxford Media. Oxford Media assured FWCC that the Prism Channel was carried on all of the cable systems listed in the Prism Marketing Materials. FWCC accepted Oxford Media's representation and, based on this understanding, executed the 2014 Contract. Given these allegations—that Oxford Media assured FWCC just prior to signing the 2014 Contract that the Prism Channel was carried on all of the cable systems stated in the Prism Marketing Materials—the alleged misrepresentations could reasonably be construed as false statements of current fact.

Nonetheless, supposing Oxford Media's statements referred to future conduct only, Oxford Media's argument still fails. FWCC specifically alleges that Oxford Media repeatedly misrepresented the scope of the Prism Channel's coverage to induce FWCC to enter into the

9

2014 and 2015 Contracts as well as a 2016 Contract. To support these allegations, FWCC points to the Prism Marketing Materials, a web site, the Renewal Letter, and certain communications between the parties. FWCC alleges that when it raised questions regarding the scope of coverage, Oxford Media repeatedly assured FWCC that the Prism Channel was carried on all the cable systems stated in the Prism Marketing Materials and that the household figure was higher than the 4.2 million figure reported by Nielsen. Based on these allegations, FWCC has plausibly alleged that Oxford Media's misrepresentations involved a fraudulent scheme to induce FWCC to enter into contracts with Oxford Media. *See Wigod*, 673 F.3d at 571 (recognizing promissory fraud claim where plaintiff sufficiently alleged a scheme to defraud). Accordingly, FWCC has plausibly alleged false statements of material fact.

*Reasonable Reliance*

Oxford Media next contends that FWCC could not have reasonably relied on the alleged false statements because FWCC is a sophisticated member of the entertainment industry and had previously used the Prism Channel for distribution. The Court disagrees. FWCC has alleged that it identified an issue with the 2014 Contract and sought clarification prior to signing. In response, Oxford Media indicated that it had made a mistake, assured FWCC that the Prism Channel reached all areas identified in Paragraph 1(d), inserted the modified language back into the Contract, and specifically initialed Paragraph 1(d). FWCC signed the 2014 and 2015 Contracts with the understanding that the scope of Prism Channel coverage was based on Oxford Media's alleged false statements regarding the scope of the Prism Channel's coverage. Construing these allegations in FWCC's favor, FWCC could have reasonably relied upon Oxford Media's alleged misrepresentations when it signed the Contracts.

*Damages*

Oxford Media challenges FWCC's allegations of damages, arguing that they are speculative at best. In its counterclaim, FWCC asserts that Oxford Media falsely stated the scope of Prism Channel's reach by stating that it reached 4.2 million households and was carried on Comcast Illinois, Wisconsin, Northwest Indiana, and Michigan. FWCC claims that Paragraph 1(d), the rate reduction clause, allows for a reasonably accurate calculation of damages. Generally, "[d]amages may not be predicated on mere speculation, hypothesis, conjecture, or whim." *Frye v. L'Oreal USA, Inc.*, 583 F.Supp.2d 954, 957 (N.D. Ill. Oct. 28, 2008). Once damages have been established, absolute certainty regarding the amount of damage is not required to justify recovery; rather, it is only necessary that evidence establish a basis for the assessment of damages with a fair degree of probability. *Giammanco v. Giammanco*, 625 N.E. 2d 990, 1002 (Ill. App. Ct. 1993). Taking FWCC's allegations as true, FWCC could reasonably calculate damages based on the numbers alleged in its counter-complaint and the rate reduction clause in Paragraph 1(d). Thus, FWCC has sufficiently alleged damages.

Because FWCC has adequately alleged false statements of material fact, reasonable reliance on those statements, and damages, FWCC has adequately pled a fraud claim. Accordingly, Oxford Media's motion to dismiss Count II is denied.

**Count III – Money Had and Received**

FWCC alleges a claim of money had and received, arguing that it was compelled to pay Oxford Media for airtime in June 2016—airtime that it never received and did not contract for—to avoid injury to its business, person or property. FWCC argues that, as a matter of equity and in good conscience, Oxford Media must refund FWCC $134,058.13 for funds paid for the June 2016 invoice.

Oxford Media moves to dismiss, arguing that FWCC voluntarily paid Oxford Media for the June 2016 airtime, there are insufficient facts to show that FWCC made the payment to avoid injury to its business, and FWCC's claim is foreclosed by its breach of contract claim. Oxford Media further argues that FWCC's July 15, 2016 demand letter shows that the FWCC made the June 2016 payment pursuant to a contract and that the value for the unused airtime amounted to $52,873.28 instead of $134,058.13. (Countercl. Ex. 33.)

To state a claim for money had and received under Illinois law, a party must allege that (1) some compulsion existed to pay money to the defendant; (2) the defendant had no right to demand the money; and (3) the payment of money from the party to the defendant was necessary to avoid injury to the party's business, person, or property. *Buttita v. First Mortgage Corp.*, 578 N.E.2d 116 (Ill. App. Ct. 1991). A plaintiff must plausibly allege that the defendant "received money that in equity and good conscience belongs to the plaintiff." *Trinity Indus. Leasing Co. v. Midwest Gas Storage, Inc.*, 33 F.Supp.3d 947, 979 (N.D. Ill. March 21, 2014). "A money had and received claim is an equitable action and is similar to a claim for unjust enrichment." *Ramirez v. Baxter Credit Union*, 2017 WL 118859, at *6 (N.D. Ill. Jan. 12, 2017), *quoting Bueker v. Madison Cty.*, 61 N.E.3d 237, 256 (Ill. App. Ct. 2016).

Here, FWCC has failed to adequately allege a claim for money had and received. According to FWCC's counter-complaint, the parties did not have a contract in place in June 2016 for distribution of SBN programming. Pursuant to the terms of the 2015 Contract, FWCC was required to notify Oxford Media of its intent to renew the 2015 Contract thirty days prior to the expiration of the Contract. It did not. Although the parties engaged in negotiations throughout May and June 2016, negotiations eventually fell apart. Without a contract in place for 2016, FWCC cannot show that it was compelled to make the June 2016 payment. *Buttita*,

578 N.E.2d 116, 118-19 (Ill. App. Ct. 1991) (dismissing money had and received claim in party because plaintiffs were not compelled pay defendant).

Moreover, FWCC has failed to show that payment to Oxford Media for June 2016 airtime was necessary to avoid injury to its business. FWCC argues that payment was necessary because it had no other means to distribute in the Chicago DMA. Def./Countercl. Pl's Resp., at p. 12. However, FWCC states in its counter-complaint that it had previously broadcast its programming in Chicago through other cable and over-the-air broadcasting companies. Presumably then, FWCC had alternative means to distribute its programming. Nonetheless, FWCC does not allege any necessity to broadcast its programming around-the-clock or that it was required to do so to avoid damage to its business. Finally, the Court notes that FWCC demanded that Oxford Media stop distributing FWCC's programming in early June 2016. It is unclear whether FWCC completely stopped distribution of its programming in Chicago or whether FWCC continued to distribute its programming through other companies. Regardless, FWCC has failed to allege the necessity of payment to Oxford Media for June 2016 airtime to avoid injury to its business.

Because FWCC's counter-complaint fails to state a valid claim for money had and received, this Court does not need to address Oxford Media's remaining arguments. Accordingly, Oxford Media's motion to dismiss Count III is granted.

**Count IV – Account Stated**

FWCC alleges that Oxford Media owes it $186,437.44 based on a theory of account stated. Oxford Media disagrees, arguing that FWCC's account stated claim fails because the parties dispute the final amount owed. Under Illinois law, "'[a]n account stated has been defined as an agreement between parties who have had previous transactions that the account representing those transactions is true and the balance stated is correct, together with a promise,

express or implied, for the payment of such balance.'" *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Group, Inc.*, 12 F.Supp.2d 974, 978 (N.D. Ill. Sept. 6, 2002) (quoting *W.E. Erickson Constr., Inc. v. Congress-Kenilworth Corp.*, 477 N.E.2d 513 (Ill. App. Ct. 1985)). Failure to object to the account statement is considered recognition of its accuracy. *Id.* at 979. An account stated claim is an alternate theory for proving damages in a breach of contract claim. *Dreyer Med. Clinic, S.C. v. Corral*, 591 N.E.2d 111, 114 (Ill. App. Ct. 1992).

As pleaded, it is unclear from FWCC's counterclaim what the $186,437.44 account stated amount represents. In the counterclaim, FWCC states that "[o]n July 14, 2016, Oxford Media sent a credit statement to FWCC showing that Oxford Media owed FWCC a credit in the amount of $184,437.44. FWCC is therefore entitled to the payment of $186,437.44 from Oxford Media as an account stated." (Countercl. ¶¶ 94, 95.) This Court is unable to discern whether this amount includes a credit from the 2014 Contract, the 2015 Contract and/or for June 2016. In its response brief, FWCC contends that the amount "showed a refund due to FWCC for unused airtime, both for June 2016 and for other uncredited downtime due to technical issues. The account stated did not address any refunds due to FWCC arising from the reduced household numbers." Def/Countercl. Pl's Reply, at p. 14. In other words, the amount represents unused airtime in 2014, 2015 and June 2016 only.

Regardless, it is clear that the parties did not agree on the final amount owed. When Oxford Media sent the credit statement to FWCC reflecting a $186,437.44 credit, FWCC did not acknowledge or acquiesce to that amount. And there is no indication that the parties agreed to the amount. Instead, FWCC sent a letter to Oxford Media the following day demanding the return of $2,040,175.21 in overcharges (based upon misrepresentations of Oxford Media's Prism distribution) as well as an additional $52,873.28 (for unused prepaid airtime in June 2016). This

14

correspondence shows that FWCC did not agree with Oxford Media regarding the final balance owed. *See Patrick Eng'g, Inc. v. City of Naperville*, 976 N.E.2d 318, 336 (Ill. 2012) (dismissing account stated claim where there was no meeting of the minds between the parties regarding the final amount owed). Because the parties did not agree on the final amount owed, Oxford Media's motion to dismiss Count IV is granted.

## CONCLUSION

For the aforementioned reasons, Oxford Media's motion to dismiss [16] FWCC's counter-complaint is granted in part and denied in part. Counts III and IV of FWCC's counter-complaint are dismissed. FWCC may proceed on Count's I and II.

**SO ORDERED.**

        **ENTERED: September 20, 2017**

        _____
        **HON. JORGE ALONSO**
        **United States District Judge**