# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

OXFORD MEDIA GROUP, INC.,     )
       )
    Plaintiff,     )     Case No. 16-cv-7511
       )
    v.     )     Hon. Jorge L. Alonso
       )
FAMILY WORSHIP CENTER     )
CHURCH, INC.,     )
       )
    Defendant.     )

## MEMORANDUM OPINION AND ORDER

After a disagreement, defendant Family Worship Center Church, Inc. ("Family") pulled

its programming from a channel owned by plaintiff Oxford Media Group, Inc. ("Oxford").

Oxford sued for breach of contract, and Family countersued for, among other things, unjust

enrichment and fraud in the inducement.[1]  Both parties have moved for partial summary

judgment.  For the reasons set forth below, Oxford's motion for summary judgment is granted in

part and denied in part.  Family's motion for summary judgment is also granted in part and

denied in part.

## I.     BACKGROUND

The following facts are undisputed unless otherwise noted.[2]

---

[1] The Court has jurisdiction over this case, because plaintiff Oxford is a citizen of Delaware (its state of incorporation) and Illinois (where it has its principal place of business).  [Docket 1 at 1]. Defendant Family is a citizen of Louisiana (where it is incorporated and where it has its principal place of business.  [Docket 13 at 2].  The amount in controversy is greater than $75,000.00.

[2] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment.  The Court enforces Local Rule 56.1 strictly.  Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted.

Plaintiff Oxford has a license to broadcast television signals in Chicago under the call letters WJYS. In addition, it operates a digital subchannel, which it calls Prism network. To sell airtime on the Prism channel, Oxford contracted with Bea Sutkus ("Sutkus"), who was paid a 30% commission on the air time she sold. Sutkus was authorized to enter contracts on Oxford's behalf, subject to Oxford's approval. Sutkus was involved in negotiating the contracts between Oxford and Family that are the subject of this case.

Family is a non-profit religious corporation founded by its leader, Jimmy Swaggart. Family is run by a Board of Trustees, consisting of Swaggart, his wife (Frances Swaggart), his son and his grandson. Family runs both Jimmy Swaggart Ministries, which creates programming, and Sonlife Broadcasting ("Sonlife"), which broadcasts the programming. Sonlife obtains revenue from donations and the sale of products, but it does not sell advertising on its broadcasts. Sonlife's goal is not to make a profit but rather "to spread the Message of the Cross to the world." In seeking to achieve that goal through broadcasting, Family focused on cost per household.

It is not clear from the parties' submissions what originally prompted the parties to begin negotiating a contract by which Family would broadcast programming on Oxford's Prism channel. What is clear is that, at some point, Sutkus and David Hamilton (an Oxford employee) traveled to Louisiana to meet with Jimmy and Frances Swaggart and Nikki Tracy ("Tracy"), a

---

*See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). The Court does not consider any facts that parties failed to include in their statements of fact, because to do so would rob the other party of the opportunity to show that the fact is disputed.

Family employee. The meeting was an introductory meeting at which the parties did not discuss terms of a potential contract or Prism's coverage.

At some point after the meeting, the parties began discussing a potential contract. Sutkus provided Tracy a marketing document that had been prepared by an Oxford employee. The marketing document stated, among other things:

> Welcome to Prism
>
> The same signal and coverage as a major television network with the intimacy of a local independent television station
> A full power multicultural TV station broadcasting from the Willis Tower (formerly Sears Tower) carried over the air on digital and on cable
>
> Prism
> A rainbow of opportunity with a signal that will make any business or organization find their pot of gold, reaching almost 11 million people in Michigan, Illinois, Wisconsin, and Indiana!
>
> Prism
> A plethora of multicultural, local, national and international programming specializing in direct response, inspirational and entertainment segments.
>
> Prism
> Chicagoland's most significant independent station, that can spread anyone's message with 30 to 60 minute spots, with affordable rates that do not discriminate!
>
> Over the Air and Cable Facts
> July 2010 Neilsen tracking of Chicago DMA
>
> Prism's signal covers 4.2 million households in America's largest market. That's almost 11 million people!
> Prism can be found on:
> COMCAST CHICAGO
> CHANNEL 385 AND 687
> COMCAST ILLINOIS,
> WISCONSIN, INDIANA
> MICHIGAN

[Docket 92 at 79].[3]

On May 16, 2014, Frances Swaggart signed on behalf of Family an agreement with Oxford for airtime on Oxford's Prism network. Sutkus signed on behalf of Oxford, with Oxford's authorization. The contract allowed Sonlife to broadcast its content on Oxford's Prism channel around the clock for twelve months. The contract states, among other things:

> **1.    BILLING AND PAYMENT**
> \* \* \*
> **d. Right to Modify Terms of Payment.** If Agency fails to make timely payment on 29th of the month, Oxford Media Group, Inc. shall have the right to change the terms of payment for further broadcasts under this contract. It is understood by all parties on this contract that Agency's acceptance of the rate stated herein is based solely upon the total number of households to which Oxford Media Group, Inc. will provide distribution, calculated as of the date identified as the "Start Date" on page one of this contract and including but not limited to, all over-the-air households as well as those subscriber households on Comcast Cable in the Chicago DMA including Comcast Chicago (Channel 385 and 687), Comcast Illinois, Comcast Wisconsin, Comcast Northwestern Indiana and Comcast Michigan. The loss of any and/or all of the cable subscriber households shall result in a reduction in Agency's rate by $.42 per household lost.
> \* \* \*
> **2. TERMINATION.**
>
> **a. Effect of Termination.** If Oxford Media Group, Inc. or Agency/Advertiser terminates this contract, Agency shall be obligated to pay only the rate as specified on the face of the contract up to and including the date of termination.
>
> **b. Additional Basis for Termination.**
> \* \* \*
> Agency/Advertiser shall have the right to terminate this Contract at any time without liability to Oxford Media Group, Inc. if Oxford Media Group, Inc. becomes insolvent, makes an assignment for the benefit of the creditor or files a petition under bankruptcy laws or has such a petition filed against it, if receiver is appointed for Oxford Media Group, Inc.'s property or business, or if Oxford Media Group, Inc. is in material breach of this Contract, provided that Oxford Media Group, Inc. has not cured such breach within 30 days from Agency/Advertiser's notice of breach.
> \* \* \*

---

[3] DMA is short for Designated Marketing Area, which is a geographical area in which the Federal Communications Commission has licensed television stations to broadcast.

**9. NOTICES**
All notices under this Contract must be in writing and shall be deemed to have
been duly given (a) when hand-delivered, (b) when sent to the recipient by email .
. . , (c) two (2) business days after the date when sent to the recipient if sent by
nationally recognized overnight delivery service . . ., or (d) five (5) business days
after the date when sent to the recipient by U.S. Mail  . . .
*   *   *

**10.  CHOICE OF LAW**
The parties to this Contract agree that Illinois law shall govern, and be applied to,
the interpretation of this contract for all disputes pertaining to this contract.
*   *   *

**12.  TERM OF THIS CONTRACT.**
The initial term of this contract begins on the date that the previous page indicates
is the "Start Date" . . . and ends on the date that the first page of this contract
indicates is the "End Date" . . .  This Contract may be extended for three (3)
additional renewal terms of one (1) year each, provided that Agency/Advertiser
provides Oxford Media Group, Inc. with notice of its intention to renew the
Contract at least thirty (30) days prior to the expiration of the current term.
Agency/Advertiser shall have the first right of refusal to match in totality any
written offer from another network of a higher bid.

(2014-2015 Contract at 1-4).

The cover sheet of the 2014-2015 Contract lists a start date of June 1, 2014 and an end

date of May 31, 2015.  On the cover sheet, the parties checked boxes for "Cash in advance,"

"Monthly invoice," and "Calendar month."  It states the contract covers airtime from "5a-

4:58am" at a "Monthly Contract" price of $150,000.00, and a "Total Contract" price of

$1,800,000.00.  According to Family, the rate of $150,000.00 per month (for a total of

$1,800,000.00 per year) was based on the number of households the Prism network reached.

Family concluded that rate was "not a bad number" for the 4.2 million households it believed,

based on the marketing document Sutkus had supplied during negotiations, that Prism reached.

From Family's perspective, it did not matter if the households were reached via cable or via

over-the-air broadcast signal.

In the days leading up to the parties' signing the 2014-2015 Contract, the parties

discussed the contract.  Family's general counsel, Wyndi Guillory ("Guillory") was involved

with the revision and drafting of paragraph 1.d. of the 2014-2015 Contract. On May 15, 2014, Sutkus wrote an email to Guillory. In the email, Sutkus stated:

> One change to the terms: I caught one thing that needs to be changed. PRISM TV is carried on Comcast Chicago DMA only and over the airwaves on all 4 states. So I changed 1d to reflect that.

On May 16, 2014, Guillory responded to Sutkus's email. In the email, Guillory stated:

> We have a very big problem. We agreed to purchase time on Prism based on the information contained in your presentation, which clearly states, that Prism is carried on Comcast Chicago, Comcast Illinois, Wisconsin, Indiana and Michigan. It has been our understanding throughout this entire contract period that, even though we were only airing a few hours per day, we were reaching all of these households. The only reason we decided to take on the additional expense of the full-time channel was the significant increase in coverage you offered. If we have not been getting that coverage all this time, that is a problem. We need to know when Prism's cable coverage was reduced to carriage solely on Comcast Chicago.
>
> In light of this critical change in coverage, I do not believe we can move forward with the new contract and we will have to consider any renewal of current agreement very carefully.

Sutkus telephoned Guillory and told Guillory that Prism's coverage was as is stated in the marketing document. Guillory did not ask Sutkus how many Comcast subscribers outside the Chicago DMA received the Prism network. Guillory could have learned from Comcast the number of subscribers in the Chicago DMA. On May 16, 2014, Guillory wrote to Sutkus that the contract was "for full-time carriage on Prism TV in the Chicago DMA." Ultimately, Sutkus approved 1.d. on behalf of Oxford, and the parties signed the 2014-2015 Contract.

A year later, Frances Swaggart (on behalf of Family) and Sutkus (on behalf of Oxford) signed a nearly-identical contract for the period of June 1, 2015 through May 31, 2016 (the "2015-2016 Contract"), with the only differences being the start and end dates.

Things seem to have gone swimmingly for the two years the contracts were in effect. During the time period when the 2014-2015 Contract was in effect and the time period when the

2015-2016 Contract was in effect, Family paid Oxford the $3,600,000.00 due under the

contracts. Oxford, in turn, carried Family's programming on its Prism channel. During that

time, Family always paid the monthly price before the start of each month. During that time,

Family did not inform its members that its programming was available on Prism outside of the

Chicago DMA.

Things seem to have soured as the parties began negotiating a contract for 2016-2017.

The timing of the negotiations is not clear from the parties' statements of fact, but it is clear that

Oxford offered Family a contract in which Family would pay a rate increase and would obtain

more time on WJYS, in addition to its 24-hour coverage on Prism. The offer was "put together"

by Oxford's president and presented to Family by Sutkus. At some point, Guillory emailed

Sutkus and said, "Please confirm what our coverage numbers are with Prism. Do we get any

cable coverage currently?" Sutkus responded, "Yes, For Prism it's Comcast plus over the air!"

Guillory then asked, "Do we have a count on the OTA households?" Sutkus responded by again

quoting the marketing document from 2014. Specifically, Sutkus said:

> The latest figures I have are very conservative at:
> Over the Air And Cable Facts
> July 2010 Nielson [sic] tracking of Chicago DMA
> Prism's signal covers 4.2 million households in America's largest market. That's
> almost 11 million people! Prism can be found on: Comcast Chicago Channel 385
> and 687 Comcast Illinois, Wisconsin, Indiana, Michigan.

At that point, Guillory asked Sutkus by email, "So the 4.2 million HH figure includes BOTH

Comcast cable and OTA homes? Please clarify." Sutkus and Guillory's email correspondence

continued as follows:

> Sutkus: That's based on Nielson [sic]. . . . we know that there are way more than
> that :) I think I can do 5% increase . . . without having to take away any of the
> added value extra airtime on WJYS TV. Will this work?

7

Guillory: Those Nielsen numbers you sent are from 2010. Do you have anything more recent?

Sutkus: We don't subscribe to Nielson [sic]. . . : (

Guillory: So you have no idea and/or no way of determining how many of the 4.2 million homes are cable? Sorry to keep repeating my questions but I have to be sure of my data when I call Brother and Sister Swaggart back about this.

Sutkus did not respond.

Meanwhile, on May 10, 2016, by which time Family had already paid Oxford for the entirety of the 2015-2016 Contract, Family sent Oxford a check for $149,500.00. The check was signed by Jimmy Swaggart, who authorized the check because he assumed the contract would renew at the existing rate. It is undisputed that the payment was voluntary.

On May 23, 2016, Sutkus wrote to Guillory and Tracy, noting that nothing was booked for Family beyond May 31, 2016. Tracy responded, saying the Swaggarts were out of town and that Family would get back to Sutkus. Sutkus responded that the extra time offered on WJYS was a bonus. On May 27, 2016, Guillory wrote to Sutkus, "Brother and Sister Swaggart want to remain on WJYS, but feel that the Church simply cannot take a rate increase at this time. We really need another year at our current rate. Please let me know if we can make that work." By the end of the day on May 27, 2016, Guillory informed Sutkus that the Swaggarts would accept a rate increase of 5%.

Guillory asked Sutkus to send a revised copy of the contract. Sutkus sent over a draft on May 31, 2016. The new written contract was significantly different from the 2014-2015 Contract and the 2015-2016 Contract. Among other things, the proposed contract removed the language from paragraph 1.d. and changed the termination rights. On June 3, 2016, Guillory emailed Sutkus about the changes and expressed Family's dissatisfaction with them. In the meantime, Oxford continued to air Family's programming on its Prism channel.

On June 7, 2016, Guillory wrote to Sutkus. Guillory said that Family would not renew its contract with Oxford. Among other things, Guillory stated in the letter, "Our research indicates that the Prism channel reaches less than half of the households claimed by Oxford Media Group, Inc." Guillory requested that Oxford cease broadcasting Family's content immediately.

Based on these allegations, Oxford brought a two-count complaint, seeking both: (1) a declaration (Count I) that it did not owe family a rebate of $.42 per lost household; and (2) damages for breach of contract (Count II). Family filed counterclaims. Among other things, Family seeks relief for fraud in the inducement (Counterclaim I) and unjust enrichment (Counterclaim II). Each party seeks partial summary judgment as to plaintiff's Count II and defendant's Counterclaims I and II.

## II.     STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III.   DISCUSSION

### A.   Family's counterclaim for fraud in the inducement

In Counterclaim I of its second amended countercomplaint, Family asserts that Oxford fraudulently induced it to enter into the 2014-2015 Contract and the 2015-2016 Contract. Oxford's theory is that Sutkus made misstatements with respect to Prism's coverage area when the parties were negotiating the 2014-2015 Contract. Specifically, Family points to the marketing document Sutkus provided to Family and to Sutkus's subsequent statement reiterating that Prism's coverage was as it was described in the marketing document.[4] Both parties move for summary judgment on this claim.

A federal court considering a claim under Illinois law attempts "to predict how the Illinois Supreme Court would decide the issues presented here." *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018). To establish a claim for fraudulent inducement, Family must establish: (1) Oxford made a false statement of material fact (2) that it knew to be untrue (3) for the purpose of inducing Family to agree to the contract; (4) that Family reasonably relied on the misstatement; and (5) that Family was damaged. *Wilkinson v. Appleton*, 28 Ill.2d 184, 187 (Ill. 1963).

Oxford argues that it is entitled to judgment as a matter of law on Family's claim for fraud in the inducement, because it would be impossible, at this point, to return the parties to

---

[4] Oxford denies that Sutkus was its agent, but she was, as a matter of law. *See Sullivan v. Glenn*, 782 F.3d 378, 380-381 (7th Cir. 2015) ("[I]f you hire someone to negotiate a deal for you, subject to your approval, that someone is your agent."). It is undisputed that Oxford contracted with Sutkus to make sales and paid her a 30% commission on such sales. Oxford gave her the authority to sign contracts with its approval. Principals are liable for fraudulent inducement by their agents. *Ackerman v. Northwestern Mutual Life Ins. Co.*, 172 F.3d 467, 471 (7th Cir. 1999) ("When an agent who is authorized to make a contract on his principal's behalf (and the principal needn't be the agent's employer and was not here) used fraud to induce the contract, the principal is liable even if the agent is acting solely to feather his own nest.").

their positions in June 2014.  Oxford's point is that it is too late to rescind the 2014-2015

Contract and the 2015-2016 Contract, because Oxford has already aired Family's content.

The Court agrees with Oxford.  It has long been the law in Illinois that a party induced by

fraud to enter into a contract can either: (1) sue on the contract; or (2) rescind the contract if it

can return the other party "to the position which he occupied before the transaction complained

of took place."  *Rigdon v. Walcott*, 141 Ill. 649, 661 (Ill. 1892); *see also Felt v. Bell*, 205 Ill. 213,

228-29 (Ill. 1903) ("Equity does not strive to save the perpetrator of the fraud from any harm.  It

does, however, stand for the principle that no party may successfully invoke the aid of equity for

the rescission of a contract unless he is willing to restore the other party to the position he

enjoyed at the time the contract was made."); *Buchenau v. Horney*, 12 Ill. 336, 338 (Ill. 1851)

("A party cannot rescind a contract of sale, and at the same time retain the consideration he

received.").  In *Rigdon*, the Illinois Supreme Court explained:

> A contract into which a party has been induced to enter by the fraud of the other
> party is not void, but is only voidable, at the election of the defrauded party.  Until
> he has elected to rescind, and has performed such acts on his part as are necessary
> to work a rescission, the contract remains in full force, and he is entitled to no
> remedy which is not based upon the theory of its continued validity.  It is a
> general rule, to which there are but few exceptions, that the restoration of the
> party against whom the relief is sought, or the offer to restore him to the position
> which he occupied before the transaction complained of took place, is a condition
> precedent to the right to rescind.  The right can be exercised only upon the terms
> of returning the consideration received, or perhaps, under the circumstances, of
> returning its value.

*Rigdon*, 141 Ill. at 660-61.  If the *defendant* has made rescission impossible (by, for example,

reconveying the consideration), the plaintiff may still rescind the contract.  *See Taylor v. Taylor*,

259 Ill. 524, 537-38 (Ill. 1913) (allowing rescission where defendant "had made complete

rescission impossible by conveying a part of the lands to innocent purchasers" and noting, "if the

defendant's act has prevented a complete restoration of the status quo, he cannot, in justice, urge this fact as a defense to the rescission.") (quoting *Pomeroy's Equity Jurisprudence* Vol. 6 § 688).

In this case, Oxford argues that Family cannot restore Oxford to the position it held in June of 2014 and, thus, cannot rescind the contract. Specifically, Oxford notes that it undisputedly aired Family's content 24 hours per day during the period of the 2014-2015 Contract and during the period of the 2015-2016 Contract. Family argues that, because it is not Family's fault that neither party can reverse time, it may still rescind the contract. The Court disagrees. It is not Oxford's fault either. Family received and used the consideration for the bargain (it ran its content on Oxford's Prism network for two years), and neither party can turn back time in order for Oxford to sell the airtime to someone else. This case is analogous to *Martin v. Heinold Commodities, Inc.*, 163 Ill.2d 33, 57-58 (Ill. 1994), where the Illinois Supreme Court held that parties to options contracts could not rescind the options. There, the plaintiffs purchased commodity option contracts, which were rights of limited duration to buy or sell a commodity futures contract at a specified price. The Illinois Supreme Court said:

> [R]escission of a contract in Illinois will only be allowed where both parties are able to place each side *in status quo*. Plaintiffs are not entitled to a rescission of their contracts with Heinold. Plaintiffs have received and used the benefit for which they bargained, the use of the [London Commodity Option]s. Thus, plaintiffs cannot return Heinold to as good a condition as it was before the sale. There is nothing left to return.

*Martin*, 163 Ill.2d at 58.[5] Just so here. Family received and used the airtime, and there is nothing left to return.[6]

---

[5] Family cites *23-25 Bldg. Partnership v. Testa Produce, Inc.*, 381 Ill.App.3d 751, 757-58 (First Dist. 2008), a case which is, at best, distinguishable and, at worst, inconsistent with *Martin*. It is different from this case, because the reason it was impossible to return the parties to their prior position was that one party had already contracted to reconvey the property.

If Family believed that the airtime Oxford provided was not consistent with the terms of the contract, it could have included a claim for breach of contract. It did not do so.

Oxford is entitled to judgment as a matter of law on Family's Counterclaim I for fraud in the inducement. Oxford's motion for summary judgment is granted as to Counterclaim I. Family's motion for summary judgment is denied as to Counterclaim I. Oxford is granted summary judgment on Counterclaim I.

### B.      Oxford's claim for breach of contract

In Count II of its complaint, Oxford asserts breach of contract against Family. In this claim, Oxford asserts that Family renewed the 2015-2016 Contract such that it remained in effect for the period of June 1, 2016 through May 31, 2017. Both parties move for summary judgment on this claim.

To be clear, Oxford is not arguing (nor is Family) that the parties agreed to a *new* contract for the 2016-2017 year under which Oxford would continue to broadcast Family's content and Family would pay 5% more than it paid the prior year. It is undisputed that the parties were close to reaching such an agreement in late May 2016. Family had agreed to the 5% rate increase, but talks fell apart when Oxford presented the draft written agreement, which was different from the 2015-2016 Contract in several material respects, including paragraph 1.d.

What Oxford claims, instead, is that the 2015-2016 Contract renewed at its existing rate for another year. The 2015-2016 Contract allowed for renewal. Specifically, it provides:

---

[6] In its reply brief, Family argues that, even if it cannot establish fraudulent inducement, it can rescind the contract due to mutual mistake. Oxford has filed a motion to strike the argument on the basis of waiver, because arguments raised for the first time in reply are, of course, waived. *Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010). Nonetheless, the motion to strike is denied, because the Court will not go to the trouble of striking that which it can simply decline to consider. In any case, the remedy of rescission is no more available on account of mutual mistake than on account of fraudulent inducement.

> This Contract may be extended for three (3) additional renewal terms of one (1) year each, provided that Agency/Advertiser provides Oxford Media Group, Inc. with *notice of its intention to renew* the Contract at least thirty (30) days prior to the expiration of the current term.

(2015-2016 Contract at ¶ 12) (emphasis added).  Paragraph nine required such notices to be in writing.  As Family points out, it is undisputed that Family did not provide Oxford any written notice in which it explicitly declared its intent to renew the 2015-2016 Contract for another year. Thus, the parties did not explicitly renew the 2015-2016 Contract for an additional year.

Oxford, though, argues that Family renewed the 2015-2016 Contract when, on May 10, 2016, Family sent Oxford a check for $149,500.00.  It is undisputed that Family always paid the monthly rate before the start of each month.  It is undisputed that Family had already paid the entire cost of the 2014-2015 Contract and the 2015-2016 Contract by the time it issued the May 10, 2016 check.  It is undisputed that the reason Jimmy Swaggart signed and authorized the May 10, 2016 check was that he assumed the parties' agreement would continue at the current rent. The only reasonable inference is that the May 10, 2016 check was for June 2016 airtime.

Oxford argues that the May 10, 2016 check is evidence of renewal of the 2015-2016 Contract for another year, but, as Family points out, the parties were in the process of negotiating a contract for 2016-2017.  Those negotiations negate any inference that the May 10, 2016 check constituted renewal of the 2015-2016 Contract for an additional year.  *Consolidated Bearings Co. v. Ehret-Krohn Corp.*, 913 F.2d 1224, 1230 (7th Cir. 1990) ("[E]vidence that the parties were negotiating a new contract rebuts the presumption by negating the inference that either party believed the contract had been renewed.") (applying Illinois law).  Here, it is undisputed that the parties continued to negotiate a contract for the 2016-2017 period even after Family sent the May 10, 2016 check for June 2016 airtime.  So, the check did not constitute renewal of the 2015-2016 Contract for an additional year.

Still, Family's payment and Oxford's receipt of the May 10, 2016 payment had legal effect: it created an implied-in-fact contract under which Family paid for June 2016 airtime and Oxford was obligated to supply it (which it did). As the Seventh Circuit has explained:

> There were also as we said a trademark license and a gasoline-supply contract. . . . They too were extended when BP continued to accept the payments prescribed by them. For the principle of the overstaying-tenant cases is general: You can't accept payment for performance without performing, when it is obvious that you are in a commercial relationship with the payor. Receipt of payment in such a context creates what is called an 'implied-in-fact contract' and is treated just like an express contract.

*Al's Service Ctr. v. BP Products North Am., Inc.*, 599 F.3d 720, 725-26 (7th Cir. 2010) (internal citations omitted); *In re: Brumshagen's Estate*, 27 Ill.App.2d 14, 23 (2d Dist. 1960) ("The only difference between an express contract and an implied contract is the mode of proof. An express contract is proven by an actual agreement or by the expressed words used by the parties. An implied contract is proven by circumstances showing that the parties intended to contract or by circumstances showing that the general course of dealing between the parties. An agreement may be said to be implied when it is inferred from the acts or conduct of the parties instead of their spoken words."); *cf. A.O. Smith Corp. v. Kaufman Grain Co.*, 231 Ill.App.3d 390, 399 (3rd Dist. 1992) ("[E]ven when a holdover tenancy is not shown, the conduct of the parties can create a month-to-month tenancy. Acceptance of monthly rental payments by the landlord will generally create a month-to-month tenancy."). The parties had an implied-in-fact contract for June 2016. That is not Oxford's claim, though, and Oxford has already been paid for the airtime it provided in June.

Oxford cannot prevail on its claim that the parties renewed the 2015-2016 Contract for an additional year. Oxford's motion for summary judgment is denied as to Count II, and Family's

motion for summary judgment is granted as to Count II.  Family is granted summary judgment on Count II.

### C. Family's claim for quasi-contract

In Counterclaim II, Family asserts a claim for unjust enrichment.  Its theory is that Oxford has been unjustly enriched, because Family used only a few days of airtime in June 2016 but paid for the entire month.  Each party moves for summary judgment on this claim.

To state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 160 (Ill. 1989).  As Oxford points out, under Illinois law, a party cannot recover for unjust enrichment in the face of a contract. *Cohen v. American Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013); *see also People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill.2d 473, 497 (Ill. 1992) (claim for unjust enrichment cannot lie where a contract governs).  That is because unjust enrichment is an *equitable* claim that "is only available when there is no adequate remedy at law." *Cohen*, 735 F.3d at 615; *see also Naugle v. Yerkes*, 187 Ill. 358, 367 (Ill. 1900) ("if the appellants have an adequate remedy at law, a bill in chancery will not lie").  The Court has already concluded that an implied-in-fact contract was created when Family paid and Oxford accepted Family's check for June 2016.  In the face of that contract, Family has an adequate remedy at law and cannot prevail on a claim for unjust enrichment. *See All Star Championship Racing, Inc. v. O'Reilly Automotive Stores, Inc.*,

Case No. 11-2160, 2012 WL 896500 at *2 (C.D. Ill. March 15, 2012) ("An implied contract is one that may be enforced in law, as opposed to enforced in equity.").[7]

Oxford is entitled to judgment as a matter of law on Family's counterclaim for unjust enrichment. Oxford's motion for summary judgment is granted as to Counterclaim II, and Family's motion for summary judgment is denied as to Counterclaim II. Oxford is granted summary judgment on Counterclaim II.

## D.  Remaining claims

Three claims remain:  Oxford's Count I for declaratory judgment, Family's Counterclaim III for breach of contract and Family's Counterclaim IV for fraud.

In Family's Counterclaims III and IV, Family alleges the existence of a contract between Family and an entity called Escomedia, Inc., which is alleged to have some relationship with Oxford. (2nd Am. Counterclaim at ¶ 97). Family alleges, among other things, that Oxford overbilled on this contract, which overbilling constituted fraud and breach of contract.

Oxford moves for summary judgment on these claims, and the motion is denied. Oxford has not included sufficient facts in its statement of facts to establish that it is entitled to judgment as a matter of law on these claims. The most glaring omission is the contract on which Family

---

[7] To be clear, an implied-in-fact contract is not the same as a quasi-contract, which is sometimes referred to as a contract implied in law. As the Seventh Circuit has explained:

> 'A familiar illustration of an implied contract is, where one person, in the absence of any express agreement, renders valuable services to another *which are knowingly accepted* by such other, the law will imply a promise to pay a fair and reasonable compensation for such services.' [*Board of Highway Comm'rs v. City of Bloomington*,] 253 Ill. 164, 97 N.E. [280,] 284 [1911] (emphasis added). But this proposition relates to 'contracts implied in fact,' not quasi-contract 'contracts implied in law.' A contract implied in fact is a contract, pure and simple. It is an agreement reached through the parties' acts and conduct."

*Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732, 743 (7th Cir. 1990).

sues, without which it is impossible to determine the merits of the claims.  Accordingly,

Oxford's motion for summary judgment is denied as to Counterclaims III and IV.

## IV.   CONCLUSION

For all of these reasons, the Court grants in part and denies in part Oxford's motion [82]

for summary judgment.  The Court grants in part and denies in part Family's motion [89] for

summary judgment.  Plaintiff's motion to strike [105] is denied.  Defendant Family is granted

summary judgment as to Count II.  Plaintiff Oxford is granted summary judgment on

Counterclaims I and II.  This case is set for status hearing on September 5, 2019 at 9:30 a.m.


**SO ORDERED.**                                    **ENTERED: August 21, 2019**

 

 

_____
**HON. JORGE ALONSO**
**United States District Judge**